G. Joseph KING, Appellant,

v.

Elizabeth W. KING, Appellee.

No. 88–150.

District of Columbia Court of Appeals.

Argued Oct. 17, 1989.

Decided Aug. 9, 1990. ·

As Amended on Denial of Rehearing Nov. 19, 1990.

---

G. Joseph King, pro se.

Eugene R. Fidell, with whom Pamela B. Forbes, Washington, D.C., was on the brief, for appellee.

Before ROGERS, Chief Judge, and TERRY and STEADMAN, Associate Judges.

TERRY, Associate Judge: )

Following a particularly acrimonious post-divorce dispute over family support payments, appellee Elizabeth King was awarded $11,010.93 in attorney's fees. One of the issues on appeal is whether this award was properly made. Appellant Joseph King contends that contract law governs this controversy because he and his former wife executed a separation and property settlement agreement before the divorce which was not merged into the final divorce decree. Since that agreement authorized an award of attorney's fees to the non-breaching party in the event of a breach, he reasons that the trial court erred in basing its award of attorney's fees on statutes and case law governing fee awards. Although we agree with Mr. King's legal analysis, we hold that the error was harmless because the award would have been no different if the court had applied contract law to the dispute. As for Mr. King's claim that the trial court abused its discretion when it failed to impose sanctions upon Mrs. King's counsel, we remand the record to enable the court to state specifically how and why it ruled as it did on two matters on which it apparently

ruled *sub silentio*, but in all other respects we reject his argument.

## I

Mr. and Mrs. King were divorced in 1983. Some time earlier they had entered into a "separation and property settlement agreement" in which Mr. King agreed, *inter alia*, to make monthly family support payments to Mrs. King and to pay her attorney's fees if he breached the agreement or defaulted in his obligations so as to require her to seek judicial relief. The settlement agreement was not merged into the divorce decree.

In 1986 a dispute arose over the education of the Kings' two children. Mr. King, displeased by his ex-wife's suggestion that the children might be removed from their private school, began to withhold the monthly support payments he was required to make under the settlement agreement. The sums withheld were placed in a bank account under Mr. King's exclusive control. At trial Mr. King admitted that his action amounted to "self-help."

In response, Mrs. King retained counsel and asked the Superior Court to issue an order requiring her ex-husband to pay the arrearages. During the ensuing court proceedings, Mr. and Mrs. King used the court's mediation program to settle the underlying dispute over the children's education and the withholding of support payments. The only matters left for formal adjudication, therefore, were Mrs. King's request for attorney's fees [1] and Mr. King's request for sanctions against Mrs. King's attorneys. On July 10, 1987, at a status conference, the trial judge told both parties that all remaining issues, including attorney's fees, would be decided at a bench trial on September 29, 1987.[2]

The trial began as scheduled. Only three witnesses testified: Mr. King, Mrs. King, and Pamela Forbes, one of Mrs. King's lawyers. Forbes testified in detail as to legal work which she and other attorneys performed on Mrs. King's behalf; in addition, detailed billing records were introduced into evidence. At the conclusion of the trial, the court took the case under advisement.

On January 15, 1988, the court issued an order in which it ruled, first, that "there is a legal basis to consider the plaintiff's request for attorney's fees pursuant to D.C. Code § 16–911(a)(1), § 16–914 and *Smith*,[3] as the action is against a former spouse to recover child support and maintenance arrearages." The court also concluded that the legal services provided were necessary. In addition, the court found that Mrs. King contributed to the delay of the proceedings by withholding discovery of certain documents from Mr. King. After considering a number of factors—including Mr. King's ability to pay child support, his financial obligation to make the payments, and the disparity in income between the two parties—the court ordered Mr. King to pay $11,010.93, which was seventy-five percent of the amount Mrs. King had requested.

At various times during the pre-trial and trial proceedings Mr. King mentioned or asked for sanctions against Mrs. King's attorneys. Because his pleadings and numerous motions were often lacking in specifics, it is difficult to separate his legitimate requests from mere tactical maneuvering. Nevertheless, it is clear that at

---

1. Mrs. King originally asked for attorney's fees in her first motion to compel support payments. Although she specifically referred to the separation and property settlement agreement as the basis for the support payments, she did not assert that she was entitled to attorney's fees under the agreement. The total amount she sought was $14,681.24, which represented sums payable to two law firms.

2. After the status conference in July, Mr. King made no discovery requests regarding work done by Mrs. King's attorneys. Nor did he request that the September 29 trial be postponed until September 28, when he filed a lengthy memorandum opposing the fee request on various grounds. On the first page of that memorandum he asserted for the first time that he should not be "forced to try this case" on September 29 on the fee issue, even though it had been made clear by the court at the July 10 hearing that attorney's fees would be at issue in the September 29 trial.

3. *Smith v. Smith,* 445 A.2d 666, 669 (D.C.1982), *cert. denied,* 459 U.S. 1115, 103 S.Ct. 749, 74 L.Ed.2d 968 (1983).

one time or another Mr. King at least referred to the possibility of sanctions under Superior Court Civil Rules 11, 26(h), and 37(a)(4). He also made assertions of bad faith litigation as an independent ground for sanctions. He based his sanction requests primarily on Mrs. King's allegedly unnecessary delay in producing documents sought in discovery, particularly a document relating to a family trust known as the Welfling Trust, and her alleged threat to remove their two children from private school. At the end of the trial, the court heard argument on the sanctions issue generally (*i.e.*, without reference to any specific rule), but its final order awarding attorney's fees made no mention of sanctions.

## II

■ Mr. King argues that the trial court committed reversible error in awarding attorney's fees to Mrs. King. He calls our attention to paragraph 29 of the separation agreement, which states:

Each party acknowledges that he and she has had the advice of independent counsel of his or her own choosing in the negotiation and execution of this Agreement. Each party states that the transfers and agreements provided herein constitute a fair, reasonable and adequate settlement of their respective rights and obligations, and that this Agreement is signed voluntarily and with full intention that it be efficacious. Neither party shall be liable for any attorney's fees or suit costs incurred by the other for any reason; provided, however, that in the event that either party breaches or defaults in his or her obligations under the terms of this Agreement, and the non-breaching or non-defaulting party is required to seek relief from a court, *the court, within its equitable powers, may award reasonable counsel fees to either party, considering the merits of the claim presented and the merits of the defense.* [Emphasis added.]

The trial court did not refer to this paragraph of the agreement in ruling on Mrs. King's request for attorney's fees, but relied instead on D.C.Code § 16–911(a)(1) (1989),[4] D.C.Code § 16–914 (1989),[5] and several cases, including *Smith v. Smith, supra* note 3.[6] The statutes and case law cited, however, apply only when a decree of divorce specifically provides for alimony and support. In the case at bar, the separation agreement between the Kings was not merged into the final divorce decree, so that the statutes and the *Smith* case do not apply. On the contrary, "[a] separation agreement which is not merged in the final judgment of divorce is governed by the law of contracts." *Clark v. Clark*, 535 A.2d 872, 876 (D.C.1987), citing *Spencer v. Spencer*, 494 A.2d 1279, 1285 (D.C.1985). We have been consistent in our approach to settlement agreements that have not been merged into divorce decrees, stating that "[w]here the parties act in good faith and their agreement is fair and reasonable, and intended as a final disposition of rights and claims regarding such matters as adult support and property rights, the court will leave the parties to continue in their relationship under the agreement." *Spencer v. Spencer, supra*, 494 A.2d at 1285–1286; *see also Alves v. Alves*, 262 A.2d 111, 118 (D.C.1970). Furthermore, when parties dis-

4. Section 16–911(a)(1) states:
   During the pendency of an action for divorce, or an action by the husband or wife to declare the marriage null and void, where the nullity is denied by the other spouse, the court may:
   (1) require the husband or wife to pay alimony to the other spouse for the maintenance of himself or herself and their minor children committed to such other spouse's care, and suit money, including counsel fees, to enable such other spouse to conduct the case, whether as the plaintiff or the defendant, and enforce any order relating thereto by attachment, garnishment and/or imprisonment for disobedience[.]

5. Section 16–914 states in pertinent part:
   After the issuance of a decree of divorce granting alimony and providing for the care and custody of children, the case shall still be considered open for any future orders relating to those matters.

6. We held in *Smith* that an order awarding attorney's fees in a post-divorce proceeding to enforce a support obligation imposed by the divorce decree was "an order relating to those matters [alimony and child support]" within the meaning of D.C.Code § 16–914. 445 A.2d at 669.

pute the meaning of the agreement, "the court must interpret it according to principles of contract law and the court's statutory responsibilities." *Spencer, supra,* 494 A.2d at 1286 (citations omitted). Thus Mrs. King's motion to enforce the separation agreement against her ex-husband was in fact a contract-based proceeding, and the trial court erred in failing to recognize that its power to award attorney's fees stemmed from the contract, not from general principles of family law.

■ We readily conclude, however, that the court's error was altogether harmless. Although the statute, D.C.Code § 16–914, authorizes judicial orders relating to "alimony and ... the care and custody of children" after a divorce decree has been issued, the settlement agreement gives essentially the same power to the court in this case. The agreement states explicitly that in the event of a breach (which would include a failure to pay support), the non-breaching party may "seek relief from a court," and "the court, within its equitable powers, may award reasonable counsel fees to either party, considering the merits of the claim presented and the merits of the defense." Thus both the statute and the settlement agreement provide for an award of attorney's fees in a post-divorce proceeding to enforce a support obligation. The court may have thought it was proceeding under the statute, but in fact it was exercising the authority granted to it by the settlement agreement. *Clark v. Clark, supra; Spencer v. Spencer, supra.*

That was its only error. At the September 29 trial, the court reviewed the agreement and then said:

> [I]t appears to me that this paragraph 29 incorporates the statute, in essence, by saying that if it has to be enforced, the non-breaching or non-default[ing party] is required to seek relief from the court. The court within its equitable powers ... may award reasonable attorney's fees ... considering the merits of the claim presented and the merits of the defense.

The court went on to apply the criteria which have developed under the statute for determining what is a reasonable award of counsel fees. *See, e.g., Kelly v. Clyburn,* 490 A.2d 188, 191 (D.C.1985); *Rachal v. Rachal,* 489 A.2d 476, 478 (D.C.1985); *Ritz v. Ritz,* 197 A.2d 155, 157 (D.C.1964). Since the settlement agreement authorizes the court to grant reasonable attorney's fees and the case law arising under the statute establishes the standard for deciding what is reasonable, we are satisfied that the court reached the same result by following the statute and the case law that it would have reached if it had followed the language of the settlement agreement; *i.e.,* it ruled that an award of $11,010.93 in attorney's fees was reasonable. While Mr. King has demonstrated that the court committed a technical legal error, he has not shown that the error had any practical effect. Accordingly, we hold that it was harmless. *See Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946).

### III

■ Mr. King contends nevertheless that the fees requested by Mrs. King and awarded by the court were unreasonable, and that the award should therefore be reversed. We cannot agree. When this court reviews an award of attorney's fees in a domestic relations case such as this, "our scope of review is a limited one because disposition of such motions is firmly committed to the informed discretion of the trial court." *Steadman v. Steadman,* 514 A.2d 1196, 1200 (D.C.1986); *accord, Smith v. Smith, supra* note 3, 445 A.2d at 669; *Darling v. Darling,* 444 A.2d 20, 23 (D.C. 1982). Consequently, fee awards will not be set aside unless the appellant makes "a very strong showing of abuse of discretion." *Steadman v. Steadman, supra,* 514 A.2d at 1200; *see Ritz v. Ritz, supra,* 197 A.2d at 156–157. Mr. King has not made such a showing.

■ In *Steadman*—where we did find an abuse of discretion—we pointed out that several aspects of the fee award made in that case were "disturbing." In particular, the moving party provided no data to the court showing attorney hours expended and rates charged. 514 A.2d at 1201.

Here, however, Mrs. King submitted documentary evidence attesting to both hours expended and rates charged. Furthermore, one of her attorneys testified at length, giving Mr. King an opportunity to establish by cross-examination whether the fees sought were unwarranted. Mr. King took advantage of that opportunity and cross-examined the attorney in some detail. Considering all the evidence, we hold that there was a fully adequate basis for the trial court's determination of the amount of the award.

Mr. King further argues that the trial court erred by not following *District of Columbia v. Hunt*, 525 A.2d 1015 (D.C. 1987), in which we adopted the "lodestar" method of calculating attorney's fees. The *Hunt* decision, however, is very specific in its intended application, as the trial court recognized: it pertains to the determination of reasonable attorney's fees "in cases under the [Federal] Backpay Act." *Id.* at 1016. While it is true that the lodestar approach is not necessarily limited to claims under the Backpay Act, *see, e.g., Ungar v. District of Columbia Rental Housing Commission*, 535 A.2d 887 (D.C. 1987), we have never held that the lodestar procedure is required in all cases. We see no reason to do so now. Given the long line of precedents dealing with attorney's fee awards in domestic relations cases, both before and after *Hunt*,[7] which make no mention of lodestars, we decline to impose on trial judges in this highly discretionary area any obligation to use the lodestar method in assessing counsel fees.[8]

In *Steadman* this court said that in setting the amounts of attorney's fee awards the trial court should consider "the quality and nature of the services performed, the necessity for the services, the results obtained from the services, and the financial ability of the spouse being ordered to pay."

514 A.2d at 1200; *accord, Ritz v. Ritz, supra,* 197 A.2d at 157. The trial judge in this case was ideally situated to make those determinations, and there is nothing in the record to suggest either that she was mistaken or that she abused her discretion in any way in ruling on Mrs. King's claim.

### IV

Mr. King also asserts that he was not informed before trial of the precise dollar amount of the attorney's fees being sought, and that this lack of information constituted "unfair surprise." In his brief he states that "the prejudice to defendant was that he did not know what claim(s) he was to defend against." This argument reflects a misunderstanding of the nature of pre-trial proceedings.

This court has held that, subject to the court's power to prevent manifest injustice, a party may not "inject an issue" into a trial that has not been raised at the pretrial conference. *Redding v. Capitol Cab Co.*, 284 A.2d 54, 55 (D.C.1971), interpreting Super.Ct.Civ.R. 16, which governs pre-trial conferences. That rule was not breached in this case. We observed in *Redding* that "[t]he purpose of the pretrial conference is to define the claims and defenses of the parties in order to narrow the issues, eliminate unnecessary proof, and lessen the opportunity for surprise, thereby expediting the trial." *Id.* This does not mean, however, that the parties must declare, by the close of the pre-trial conference, precisely what the evidence will prove; indeed, in many cases that would be virtually impossible. Despite Mr. King's numerous protestations that he was entirely unaware of the dollar amount sought, it is quite clear that he knew well in advance what *issues* would be litigated at trial. In the context of this case, Rule 16 required nothing more.

7. *E.g., Tydings v. Tydings*, 567 A.2d 886, 889–891 (D.C.1989), decided more than two and a half years after *Hunt*.

8. Lodestars first appeared in the judicial firmament in the early 1970's. *See Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 166–169 (3d Cir.1973), *opinion after remand*, 540 F.2d 102 (3rd Cir.

1976) (en banc). Mr. King has not cited any case, and we have found none, in which the lodestar procedure has been followed in the area of domestic relations. *See Ritz v. Ritz, supra*, 197 A.2d at 157 ("the trial court is not bound by any mathematical computation of time consumed multiplied by some hourly rate").

Mr. King relies on *Steadman v. Steadman, supra,* to support his argument that he was prejudiced by Mrs. King's failure to provide precise figures at the pre-trial stage. The opinion in *Steadman* notes that the moving party "submitted no fee petition setting forth hours expended and rate charged." 514 A.2d at 1201. What Mr. King overlooks, however, is that the request for attorney's fees in *Steadman* was "an eleventh hour request ... unsubstantiated by *any* attempt at accounting...." *Id.* (emphasis added). In this case Mr. King was fully aware months in advance that the trial would be primarily about attorney's fees. At the status conference on July 10 the court made it very clear that the fee issue would be litigated at the trial on September 29. Just before the hearing ended, the following discussion took place regarding the September trial:

MR. KING: ... Your Honor, I sense that there will be nothing to be tried but this fee issue which has come up. And, as Your Honor may understand, under the dispositive case law, I will be entitled to an evidentiary hearing on this.

THE COURT: Oh, absolutely. And that's what we'll do.

MR. KING: And I would need time to call expert witnesses.

THE COURT: Let me say to you this: That if everything else is resolved, in other words, on the substantive underlying issues, *then this will be the hearing on the attorney's fees.* If there are trials and things to resolve, it may not be able to be. *But prepare as if it is.*

MR. KING: So I will line up expert witnesses to put on evidence that day on the quality of the services rendered for which I seek [*sic*] to be assessed?

THE COURT: Absolutely. Yes.

MR. KING: Thank you, Your Honor. [Emphasis added.]

It is clear from this exchange that Mr. King had ample notice that attorney's fees were to be the principal issue, perhaps the only issue, at the forthcoming trial. Despite his awareness of what was coming, however, he made no effort to obtain discovery as to the amount of time Mrs. King's attorneys spent on the case or the nature of the services they rendered, even though he had almost three months in which to do so. His failure to seek discovery in these circumstances is fatal to his claim of error. On this record we are compelled to conclude that, in the absence of a specific showing that Mr. King suffered some articulable prejudice as a result of the pre-trial procedures, he has no legitimate ground for reversal.[9]

V

Mr. King also claims that the trial court erred when it failed to impose sanctions upon Mrs. King's attorneys. We hold that, for the most part, the trial court acted within the bounds of its considerable discretion. In two instances in which the court failed to rule expressly on pending requests for sanctions under Rule 11 and expenses under Rule 37(a)(4), we remand the record for supplementation.

#### A. *Rule 11*

Although the record is bulging with a variety of pleadings and motions filed by Mr. King in the trial court, he never made a formal motion for sanctions under Super. Ct.Civ.R. 11.[10] However,

9. Mr. King complains strenuously about the fact that the court never entered a pre-trial order. In light of the excerpt from the record which we have just quoted, we are satisfied that the lack of such an order, if error, was harmless. At the July 10 hearing, the court expressed a willingness to enter a pre-trial order if the mediator failed to resolve the case on the merits before the September trial date. After some discussion of the availability of the parties, counsel, and the court on various dates in August and September, it was generally agreed that a pre-trial order would not be necessary if the mediator resolved "the substantive underlying issues" be-

tween the parties, leaving only the matter of attorney's fees for resolution at trial. Since that is exactly what happened, appellant has no cause now for complaint.

10. Actually, the Superior Court Civil Rules do not apply in domestic relations proceedings, which are governed by their own set of rules. In many instances, however, the Domestic Relations Rules are identical, or almost identical, to the Civil Rules. In particular, Super.Ct.Dom. Rel.R. 11 is, with one small exception not relevant here, exactly the same as Super.Ct.Civ.R. 11. When we refer in this opinion to "Rule 11,"

buried in the middle of his "Memorandum of Points and Authorities in Support of Second Rule 37 Motion for an Order Compelling Plaintiff to Produce Documents (First Request)," filed July 2, 1987, is a request for sanctions under Rule 11 as well as Rule 37.[11] The court was certainly aware of the Rule 11 request, and it appears to have been assumed by the parties and the court that this was one of the matters to be ruled upon at the September 29 hearing. Accordingly, we read the trial court's order as a *sub silentio* denial of the request.

In *Stansel v. American Security Bank*, 547 A.2d 990, 996 (D.C.1988), *cert. denied*, — U.S. ——, 109 S.Ct. 1746, 104 L.Ed.2d 183 (1989), we held that a one-sentence order denying a motion for Rule 11 sanctions was insufficient to enable us to decide whether that denial was correct or incorrect. Because we also took occasion to set forth, for the first time, the applicable standards for ruling on a Rule 11 motion, we vacated the trial court's order and remanded the case for reconsideration *de novo* in light of those newly-announced standards. We ordered a similar remand in another Rule 11 case, *Montgomery v. Jimmy's Tire & Auto Center, Inc.*, 566 A.2d 1025 (D.C. 1989). We think a remand is called for here as well.

Accordingly, we remand the record and direct the trial court to supplement it with a ruling on Mr. King's request for Rule 11 sanctions, accompanied by findings of fact and conclusions of law, or an equivalent statement of reasons. We reiterate briefly the two-step procedure which we outlined in both *Stansel* and *Montgomery*. First, the court has discretion to "determine whether there was a rule 11 violation at all." *Montgomery, supra*, 566 A.2d at 1028. Second, if the court concludes that a violation occurred, it *"must* impose 'an appropriate sanction' under the rule; it has

no discretion to refrain from sanctioning an offending party or attorney." *Stansel, supra*, 547 A.2d at 996 (emphasis in original); *see Montgomery, supra*, 566 A.2d at 1028–1029 & n. 4. On the other hand, if the court concludes that there was no Rule 11 violation, then there is no occasion to proceed to the second step, and its determination that Rule 11 was not violated is subject to review only for abuse of discretion. *See id.* at 1029.

Finally, we note that at the time the trial court entered its final order in this case, neither *Stansel* nor *Montgomery* had been decided. The court cannot be faulted for its lack of clairvoyance in failing to apply the principles which we announced for the first time more than eight months later in *Stansel*.

### B. *Rule 26(h)*

Mr. King argues that "discovery violations" concerning answers to an interrogatory required the trial court to impose sanctions pursuant to Rule 26(h).[12] On March 25, 1987, Mr. King filed a motion to compel discovery, asking the court to require Mrs. King "to respond to certain requests to admit and ... to answer certain questions propounded at her deposition." While the trial court did not issue a written order with respect to this motion, it did address its substance almost immediately after it was filed. At a hearing the next day, March 26, the following exchange took place between the court, Mrs. King's counsel, and Mr. King:

> THE COURT: Now let's deal with the portion of the motions that we appropriately should deal with. Now, I want to move to compelling answer to first interrogatory [the subject of Mr. King's motion], and in light of what I have just said, I need to look at that piece by piece. I'm going to take that one piecemeal.
>
> Ms. FORBES: Your Honor, I made a suggestion at the beginning of this hear-

---

therefore, we shall be speaking of both the Civil and the Domestic Relations rules bearing that number.

**11.** Mr. King did not call our attention to this item in the record; we discovered it fortuitously while looking for something else.

**12.** Domestic Relations Rule 26(h) is identical to Civil Rule 26(h). See note 10, *supra*.

ing to which I don't believe Mr. King has had an opportunity to respond.

THE COURT: Go ahead. I'm sorry.

MS. FORBES: I would be perfectly well prepared not to argue either one of these motions, but rather for Your Honor simply to say what permissible discovery is in this matter.

MR. KING: I have no objection to that.... I would be happy to have some parameters set.

Thereafter the parties engaged in a detailed discussion of what discovery would and would not be allowed. Mr. King made no objection to the proposed discovery solutions and failed to bring up his motion to compel at any later time. In these circumstances we hold that he has waived the point.

### C. *Rule 37(a)(4)*

On August 15, 1986, Mr. King formally requested documents relating to a trust fund set up by his ex-wife's father (the Welfling Trust). The trust instrument was not produced by Mrs. King and her attorneys, who disputed its relevance. Mr. King did not gain access to selected provisions of the document until parts of it were filed with the court in April 1987. Mrs. King's failure to produce parts of this instrument until late in the proceedings was the basis for Mr. King's request for sanctions under Rule 37(a)(4).[13]

In this instance "sanctions" is a misnomer. Mr. King filed a motion on September 30, 1986, to compel production of the documents which he had requested on Au-

gust 15, and at the end of that motion he asked for an award of "expenses ... pursuant to Rule 37(a)(4)...." Such an award is available under the rule if the motion to compel is granted.[14] In this case Mr. King's motion was granted only in part. He had sought to obtain a copy of the entire trust instrument, but the court, in an order dated April 28, 1987, directed the production of "[a]ll excerpts of any provisions in clauses in the [trust document] that may be interpreted to permit the invasion of its corpus, or its earnings, to provide for or assist with the expenses of educating the decedent's grandchildren [Mr. and Mrs. King's children]...."

It does not appear that the trial court ever expressly ruled on Mr. King's request for expenses under Rule 37(a)(4); at least, neither of the parties has called our attention to such a ruling, and we have not found one in the record. Since we are remanding the record anyhow for another reason, we include the Rule 37(a)(4) request within the scope of the remand and ask the court to place its ruling on the record, supported by an appropriate statement of reasons.[15]

### D. *Bad Faith*

■ Mr. King asserts that "bad faith" on the part of Mrs. King and her counsel justifies an award of attorney's fees. In particular, he argues that his ex-wife never intended to carry out her "threat" to remove the children from their private school and that, accordingly, the litigation was not

---

**13.** Domestic Relations Rule 37(a)(4) is identical to Civil Rule 37(a)(4). See note 10, *supra*.

**14.** Rule 37(a)(4) provides in pertinent part:
   If the motion [to compel discovery] is granted, the Court shall, after opportunity for hearing ... require the party ... whose conduct necessitated the motion or the party or attorney advising such conduct or both of them to pay to the moving party *the reasonable expenses incurred in obtaining the order, including attorney's fees,* unless the Court finds that the opposition to the motion was substantially justified or that other circumstances make an award of expenses unjust.
   \* \* \* \* \* \*
   If the motion is granted in part and denied in part, the Court may apportion *the reason-*

*able expenses incurred in relation to the motion* among the parties and persons in a just manner. [Emphasis added.]

**15.** Since Mrs. King did eventually produce the trust documents which the court ordered her to produce, there is no occasion for the imposition of sanctions under Rule 37(b)(2) (as distinguished from an award of expenses under Rule 37(a)(4)).

pursued for "good faith" reasons. We reject this argument out of hand.

"Attorney's fees for bad faith litigation are ... proper only in the presence of extraordinary circumstances or when dominating reasons of fairness so demand." *Synanon Foundation, Inc. v. Bernstein,* 517 A.2d 28, 37 (D.C.1986) (citations omitted). Here the very reason for the litigation was Mr. King's resort to self-help. By withholding support payments legitimately due to Mrs. King, Mr. King placed her in a position where litigation was far from unreasonable. As this court has noted, "the bad faith exception is intended to punish those who have abused the judicial process and to deter those who would do so in the future." *Id.* at 37 (citation omitted); *accord, e.g., General Federation of Women's Clubs v. Iron Gate Inn, Inc.,* 537 A.2d 1123, 1128 (D.C.1988). Although the court did not award Mrs. King the full amount she requested, it did rule for her on the merits of her claim, noting that the litigation resulted from Mr. King's "willful failure to provide child support, as set forth in the parties' Separation Agreement...." Considering the entire record, we cannot find any abuse of discretion [16] in the trial court's failure to impose sanctions against Mrs. King or her attorneys on the ground of bad faith.

### VI

We affirm the trial court's award of $11,090.93 in attorney's fees to Mrs. King. We remand the record to the trial court with directions to supplement it with rulings on Mr. King's requests for sanctions under Rule 11 and expenses under Rule 37(a)(4), as set forth in sections A and C of part V of this opinion.[17] We leave it to the trial court to decide, in its discretion, whether to make these rulings on the basis of the existing record or to hold further hearings or invite further written submissions from the parties. We retain jurisdiction of this appeal and direct the trial court, upon completion of the remand proceedings, to return the record to us promptly, as supplemented. In all other respects the order from which this appeal is taken is affirmed.

*Affirmed in part, record remanded in part.*

---

**16.** *See General Federation of Women's Clubs, supra,* 537 A.2d at 1129; *Synanon, supra,* 517 A.2d at 38.

**17.** We express no view, of course, on the merits of either of these requests.